DOROTHY SMYTH NIELSON, APPELLANT, V. A. B. KAM-
MERER, ADMINISTRATOR, ET AL., APPELLEES.

FILED DECEMBER 7, 1934. No. 29033.

*Littrell & Patz,* for appellant.

*Dort & Witte, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY
and PAINE, JJ.

EBERLY, J.

This is an action in equity, in effect to secure the
specific performance of a claimed contract of adoption,
whereby, it is alleged, Fred P. ·Smyth, and his wife,
Hannah Marie Smyth, stipulated and agreed "that, in
consideration of their being permitted to take this plain-
tiff (Dorothy Smyth Nielson, who will also be referred
to herein as "Dorothy") into their home as their own
child, that they * * * would adopt this plaintiff and
make her as their own child and daughter." These
allegations were denied by the defendants who are the
natural heirs of Fred P. Smyth. It is also admitted in
the record that Fred P. Smyth died intestate on June
23, 1931, and the defendants named are his surviving
legal heirs and next of kin. This issue was tried to the
district court and determined in favor of the defendants.
Plaintiff appeals.

We are committed to the doctrine that a contract to
adopt the daughter of a stranger, made by parties
otherwise competent to contract and established by suffi-
cient satisfactory evidence, may be enforced by specific
performance, where she has fully performed her part,
and its nonfulfilment by the promisors would amount

to a fraud on the party who has thus fully performed. *Kofka v. Rosicky*, 41 Neb. 328; *Pemberton v. Heirs of Pemberton*, 76 Neb. 669; *Peterson v. Bauer*, 83 Neb. 405; 1 C. J. 1376.

Sections 43-101 to 43-112, Comp. St. 1929, provide for adoption. It is obvious that a contract to adopt made in this state must be construed in reference to these provisions, and that the limitations embodied therein, express or implied, are necessarily applicable to contracts to adopt. Valid contracts may be made and entered into only by parties who, in view of the subject-matter, are competent to make them. The provisions of section 43-102 prescribe at least by fair implication the qualifications of one assuming by contract or by court proceeding to relinquish custody and control of a minor child, and consent to its adoption by another. In consideration of this section, this court in *Tiffany v. Wright*, 79 Neb. 10, 14, employed the following language:

"For the beneficent purpose of providing homes for homeless infants, all of the states of this Union have enacted statutes of adoption, which are of civil and not of common-law origin. These statutes are all primarily based upon the consent of the child's parent, or parents, if living and accessible, and the exceptions, which permit adoption without such consent, must clearly come within the provisions of the statutes. *Furgeson v. Jones*, 17 Or. 204; Rice, American Probate Law and Practice, pp. 551, 552."

In the present case plaintiff's evidence is, in effect, in part as follows: That her father died on November 3, 1909, and her mother died on February 6, 1914. At the time of her mother's death plaintiff was seven years of age, and her older sisters, Mate Henning and Phame Claussen, were married, Mrs. Henning living in Fairbury, Nebraska, and Mrs. Claussen residing in North Platte, Nebraska. At the time of her death plaintiff's mother called plaintiff's elder sisters together and gave the custody and care of plaintiff and her younger

brother into their keeping. Mrs. Claussen, after the mother's death, took the baby boy, and Mrs. Henning kept plaintiff in her home in Fairbury for three years. In 1917 Mrs. Henning permitted plaintiff to go out in the country with a family by the name of Kneider to perform domestic services. In October, 1917, Mrs. Henning with her husband was compelled to remove to North Platte on short notice. Before leaving Fairbury, Mrs. Henning had a brief talk over the telephone with plaintiff and arranged with a Mrs. Marietta to look after Dorothy until such time as she could send for her; that she did not abandon Dorothy nor did she give Mrs. Marietta custody of her. However, Dorothy becoming dissatisfied with her surroundings at the Kneider home, at Mrs. Henning's request, Mrs. Marietta sent for Dorothy, brought her to Fairbury, and placed her in the home of a Mrs. Blachert. She arrived in Fairbury about October 17, 1917, and remained in the Blachert home from October 19, 1917, to February 14, 1918. At this time plaintiff entered the Smyth family under arrangements made orally by Mr. and Mrs. Smyth with Mrs. Blachert, which were in turn approved by Mrs. Marietta. The exact nature of the engagements entered into at this time is a matter of disputed evidence. However, we deem this question of no practical importance. The child was then 12 years of age, and as a minor was within the purview of section 43-102, Comp. St. 1929. Her parents having died, and no guardian having been appointed, the applicable provision was: "Sixth. Any person, corporation or association that shall have had the lawful custody or control of any minor child for the period of six months last preceding, for the support of which neither parent shall without just cause or fault have contributed anything whatever during such period, may consent to its adoption." Comp. St. 1929, sec. 43-102, subd. 6. Obviously, neither Mrs. Marietta nor Mrs. Blachert, under the statutory limitation quoted, were persons competent to make a contract for adoption or

consent to adoption in February, 1918. Therefore, it would follow that any contract of adoption, if then made, would have been invalid for want of competent parties. That no contract for adoption had been entered into by the Smyths with these parties prior to February 25, 1918, may well be inferred from Mrs. Marietta's letter written to the Smyths on that date, in reference to plaintiff, after a demand had been made by her sisters on the Smyths for the return of Dorothy to North Platte, Nebraska. In this connection, Mrs. Marietta says in this letter, in part: "However, you have Mr. Smyth have some one in Pawnee county appointed guardian right away, some good friend of yours. Then he can control the child, or Mr. Smyth himself can be appointed guardian as Dorothy is an orphan child and has no legal guardian. Should you want to adopt her at some future time it would perhaps be better to have some one else appointed as guardian, then it would be easier to take out adoption papers later."

Not only were Mrs. Marietta and Mrs. Blachert at this time incompetent to consent to the adoption of Dorothy, because of lack of qualifying custody and control for the statutory period of six months, but the letters in evidence, written contemporaneously by Mrs. Marietta, contain expressions wholly inconsistent with the theory that an actual contract of adoption had been entered into by the Smyths with these parties at or prior to the dates thereof. This fact tends to negative the conclusion that such a contract was ever attempted to be made by any of these parties, and furnishes corroboration of the positive denial thereof by Mrs. Smyth.

It follows that the evidence relating to this point, taken as an entirety, must be deemed to fairly establish that at least prior to February 25, 1918, no valid contract of adoption binding upon the Smyths existed.

However, plaintiff claims that a valid contract of adoption was made thereafter by letters exchanged between the Smyths and Mrs. Henning. On this subject plaintiff's

evidence tends to establish, in substance, that, after Dorothy had been left with the Smyths, Mrs. Marietta notified Mrs. Henning at North Platte of what had been done. Mrs. Henning immediately repudiated the transaction, whatever its legal effects may have been, and wrote to plaintiff, inclosing $15, and requested her to leave the Smyths and come to her sister's home (Mrs. Henning's home) in North Platte. The Smyths thereupon returned the $15, and in a correspondence that followed, it is claimed, offered various inducements and promises to faithfully adopt Dorothy as their own child in consideration of her being permitted to remain with them as such. After Mrs. Henning had received many letters from the Smyths, in which it is claimed they pleaded for permission to keep Dorothy and promised to adopt her, Mrs. Henning sent her sister, Mrs. Claussen, to the Smyth home, for the purpose of investigation, where she visited for three days. To her, it is claimed, the promises of the Smyths as to adoption were reiterated, but Mrs. Claussen's evidence is to the effect that she then made no contract, but informed the Smyths that it was necessary that Mrs. Henning consent. Mrs. Claussen thereupon went back to North Platte and reported the situation to her sister, Mrs. Henning, who thereafter, in reply to a letter from the Smyths asking permission to adopt Dorothy, by a letter written by her consented to such adoption. The sisters, Mrs. Claussen and Mrs. Henning, each claim to have read all letters received from the Smyths relating to this subject, and to have personal knowledge of all letters sent in reply to these letters thus received from the Smyths. The plaintiff likewise claims to have been present in the Smyth home when these letters were written and received, and thus to have obtained knowledge of the contents thereof.

Plaintiff's witnesses testify that these letters have been destroyed or lost, and upon the basis of this foundation testify to the statements of the Smyths therein

contained. None of the letters sent to the Smyths on the subject of the adoption, in the year 1918 or later, could be found or produced. The trial court then properly permitted secondary evidence of the contents of all these communications. While plaintiff's witnesses testify that the letters of, and which were signed by, "Mr. and Mrs. Smyth" contained direct offers to adopt plaintiff, Mrs. Smyth positively denies this testimony and asserts no adoption agreement was ever made or proposed by her husband and herself, or ever assented to by her or her husband. Mrs. Smyth further testifies that in response to a letter written by herself and husband, substantially contemporaneous with the sending of a telegram in February, 1918, relative to keeping Dorothy in the Smyth family, Mrs. Henning replied as follows: "She (Mrs. Henning) said you can keep Dorothy but you can't adopt her because mother made us promise before she died, either said before she died on her death bed or before she died not to let any one adopt those two little ones." She also testifies that nothing was done by the Smyths towards the adoption of the plaintiff, no adoption proceedings were ever had, and no offer or agreement to adopt was ever made by the Smyths; further, that the child was taken into their home; that both her husband and herself loved Dorothy, they became much attached to her, and treated her, while she was living with them, in all respects as a natural daughter would have been treated by them. It will be remembered that this conflicting evidence was entirely oral and was adduced in the presence of the trial judge.

In this connection, Mrs. Grace Thoman, a Red Cross nurse employed in Pawnee county, testified that in 1923 or 1924, while she was sharing Dorothy's room at the Smyth home, in a conversation had with Dorothy, the following statement was made by the latter: "She (Dorothy) told me very definitely and proudly * * * she said that she wasn't an adopted child because her mother

had requested definitely they weren't to be,—the younger children were not to be adopted."

So, also, Rev. Isaac Crawford Rankin, aged 73 years, a retired minister of the United Presbyterian Church and a resident of Kansas at the time of testifying, but who followed his calling at Burchard, Pawnee county, Nebraska, from 1924 to 1928, testified that, during seasons of bad roads in 1924 and 1925, Dorothy, the plaintiff, sometimes remained at the parsonage in Burchard for the night; that on one of these occasions he testifies the following occurred: "We were talking about her name Dorothy Smyth, and she said, 'My name is not really Smyth.' She said, 'My name is really Inman.' She said, 'I have been making my home at the Smyths and I am generally called Dorothy Smyth,' but she said, 'I have never been adopted by the Smyths.' Then she went on to state in the progress of the conversation that her mother had made her sisters, as I remember, two older sisters, promise not to permit any one to adopt either herself or her brother." Mrs. Haddie E. Rankin, wife of Rev. Rankin, was present when the foregoing statements were made, and fully corroborates her husband's evidence as to what was said. However, plaintiff positively and unequivocally denies the occurrence of these conversations.

The testimony of Mrs. Claussen, sister of plaintiff and a witness in her behalf, given on this subject, upon cross-examination, may be enlightening:

"Q. Mrs. Claussen, you say that a letter was written by Smyths to you or Mrs. Henning after they sent a telegram to you, about Dorothy's not coming home in response to some request that you had made? A. I did. Q. Now, did you write them a letter in answer to that? A. No; I did not. Q. Do you know whether your sister did? A. She did. Q. You know that she did? A. I do. Q. Was that the letter in which you said that you told the Smyths that, or that the Smyths were told that, you wouldn't permit the Smyths to adopt her,

that your mother had requested you to keep the family together, or words to that effect? A. Well, something to that effect. Q. There was such a letter written to the Smyths, was there not, by you or your sister? A. My sister. Q. Yes; in which you explained to them why you didn't want to consent to Dorothy's adoption? A. I think so. Q. And that was because your mother had requested you and your sister to keep the family together? A. The two children. Q. Yes; Dorothy and the smaller boy? A. Yes, sir. * * * Q. And you and your sister, Mrs. Henning, were both satisfied in the summer of 1918 after your visit with the Smyths to permit your sister Dorothy to remain there, weren't you? A. Yes. Q. And whether Smyths made an agreement to adopt Dorothy or not, you and your sister were perfectly willing that Dorothy remain with them, weren't you? A. Yes, sir. Q. So that the so-called adoption agreement that you speak of had nothing to do or did not change your mind, your attitude with reference to leaving Dorothy at the Smyth home, did it? A. No."

We do not attempt to abstract or epitomize the evidence in this record, which covers 885 typewritten pages. It unquestionably discloses that the Smyths received the plaintiff into their home and accorded her the love and advantages that a natural daughter might hope to receive. They called her their daughter, and introduced her as such to their friends. She addressed them as her parents. The advantages of schools and instruction were placed at her disposal. However, the crux of this case was the existence of an actual contract of adoption made and entered into by parties who were competent to contract. The burden of proof of this fact, as determined by the issues, is upon the plaintiff. The competent evidence on this point is oral, and was testified to by witnesses in the presence of the trial court. It is in irreconcilable conflict. It is axiomatic that mere numbers of witnesses do not necessarily determine the question of the preponderance of the evidence. Under the circumstances

presented by this record, the applicable principle appears to be the following:

"Upon appeal in actions in equity, this court is required by the statute to try the issues *de novo,* without reference to findings of the trial court; but, when the testimony of witnesses orally examined before the court upon the vital issues in the case is conflicting, so that it would be impossible that both versions of the transaction can be true, this court will consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite." *Shafer v. Beatrice State Bank,* 99 Neb. 317. See, also, *State v. Delaware-Hickman Ditch Co.,* 114 Neb. 806; *City of Wilber v. Bednar,* 123 Neb. 324.

It follows that, on a trial *de novo,* it is now determined that the plaintiff in this case has not successfully carried the burden of proof, and the judgment of the district court is

AFFIRMED.